The final argument in the final matter on today's argument calendar, Tewinkle v. Capital One, 2020-49. Ms. Nichols. Thank you. Good morning and may it please the court. My name is Leah Nichols for Appellant Bradley Tewinkle. The decision below dismissing Tewinkle's Equal Credit Opportunity Act claims should be reversed both because Mr. Tewinkle has alleged an Article III injury in fact and because on the merits Mr. Tewinkle is an applicant under the statute. I'll start with Article III standing. Mr. Tewinkle's allegation that Capital One's violation of ECOA's requirement that it provide a statement of reasons for the revocation of his credit harmed a concrete interest Congress sought to protect, giving rise to his injury in fact. In Stribble, this court explained that under the... I'm curious, maybe this is an appropriate time to ask. If you're right about standing and your client has standing, do we move to the merits ourselves or do we have to remand to the district court to... The question is do we decide ourselves, if we agree with you on that, do we decide ourselves the merits question or do we send it back to the district court to do that and why? Your Honor, it's our view that you should go ahead and decide the merits question of whether or not he is an applicant. And the reason why is because the district court made that decision in the course of... It improperly conflated the standing and the merits analysis and made the decision about whether or not Mr. Tewinkle is an applicant under the statute. And so there's no reason to remand to the district court. The district court has already made that determination. We know what it's going to do. Right. We know what it's going to do. Capital One brought a 12B1 and a 12B6 motion to dismiss. My question is whether we know what it's going to do as a legal standard. I think it would be futile to... Well, it would be a waste. Basically, it would be a waste of time because we know what he's already told us. He being the judge or the judge and the magistrate, they've told us and what more do we want? Why should we require them to tell us again? Right? Right. And the issue was fully briefed below. It was in... That's fine. That's good. Okay, great. Thank you. And I'll continue with the... I'm happy to, of course, answer any questions on either issue. I'll continue with the standing point. In Struble, this court explained that under the Supreme Court's Spokio decision, an alleged statutory violation can, on its own, be a concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interest and where the procedural violation presents a risk of real harm to that concrete interest. As at least three circuits have held, one of the concrete interests protected by ECOA is borrower education, specifically ensuring that borrowers know the reason why creditors view them as not creditworthy. Because Capital One did not provide the reason for his credit account termination to Mr. Twinkle, that concrete interest is harmed, full stop. We don't even need to reach the second part of the Spokio-Struble analysis, which is whether any risk of harm is material. Here, there is harm. In this way, the case is more akin to the informational injury cases, Aikens and Public Citizen, in which the Supreme Court held that there's Article III standing where the statute creates a right to certain substantive information, and that right isn't honored. May I ask you a question about the merits? Is there an allegation that Mr. Twinkle ever applied for an overdraft line of credit? Is that something you do? I can't remember, actually. Is that something you do, or is that something you just get? Your Honor, neither the complaint nor the record indicates one way or the other, but what we know from the email from Capital One closing his accounts is that Capital One viewed the overdraft line of credit as part of the checking account. If you look at the notice, which is on page 17 of the appendix, it says, we close your 360 checking, including your overdraft line of credit and your debit card. Let me respond. The first checking account I ever got was when I went to college, and I didn't have enough money to even get free checking. I had to pay for checking. Now, if I put more money into my checking account, if I had opened it with a larger amount, I would have gotten free checking, and if I put in even more, I would have gotten a toaster. I didn't view that as an application for a toaster, and it seems to me that this overdraft is sort of like a toaster, isn't it? Is this really an application for credit? Your Honor, I disagree, or at least that's a question left open by the record at the least. I mean, here again, the only thing that we have in the record is Capital One's email terminating Mr. Twinkle's accounts. In there, Capital One is viewing the overdraft line of credit as part of that account, and so when you apply for an account and credit is potentially part of that account, you're applying for credit. That's our view. I want to ask a different question about whether there is an adverse action, because an adverse action includes a denial or revocation of credit, and can this really be called a revocation of credit? This is a cancellation of his right or his privilege to write checks, right? The credit only applies with respect to checks that are written. It's not a freestanding credit account. He gets overdraft protection if the checks that he writes exceeds the balance in his checking account, right? Your Honor, again, we don't have any information about how this particular overdraft line of credit works. It actually might be a line of credit that based on this, even if he loses his checking account privileges, he can nevertheless get money to somehow do home improvements. Your Honor, again, we don't have any record about that. There are some overdraft lines of credit that include an ability to get cash, for example. Wait, an ability to get cash if you don't have the checking account anymore? Your Honor, I think it's, again, Capital One views these as part of the same account. But the point is, even if it is credit, it would be credit only with respect to check-writing privileges that no longer exist. So is that a revocation of credit? Your Honor, we're posing a hypothetical, right? To be clear, those aren't the facts here. The facts here are that all of his accounts were closed, including the parts of his account that have credit. And so we know that, at least in his case, his credit was revoked. And I want to be clear, there are some consumers who use overdraft lines of credit as a line of credit that is more important to them, for example, than— They use it without the ability to write checks? Your Honor, again, we don't have the details of the terms of this overdraft line of credit in the record here. And so on the facts that we have here, there's no question that he had credit and it was revoked. And that's all that's required to be an adverse action under the statute. Now, very briefly, I just want to say one or two sentences. I'm happy to answer further questions about standing. I thought we'd moved past standing already. Yes. On the applicant question, very quickly, I just want to, you know, in our brief, we explain why under the terms of the statute itself, why Mr. Twinkle is an applicant. And if there's any ambiguities, he's an applicant under the regulations. I just want to say, you know, Capital One's interpretation runs headlong into what Congress intended when it passed ECOA, because under Capital One's interpretation, it would be perfectly permissible for a creditor to terminate a woman's credit account when she got married because she got married. That would be perfectly permissible under Capital One's interpretation of applicant. And it is directly contrary to— Take me through that again. Sure. So whatever applicant means, that is, does applicant mean those who have existing and terminated accounts in addition to those who are in the process of applying for credit? That is going to govern the interpretation of applicant everywhere in the statute. In 1691 subsection A, which is ECOA's top line prohibition on discrimination, that prohibition is done in terms of an applicant, right? So it's only prohibited under the statute to discriminate against an applicant. So if applicant is interpreted as narrowly as Capital One suggests, it would be perfectly permissible under ECOA to discriminate against a woman based on her marital status by terminating her account. That doesn't exclude the possibility that there are statutes that would govern. There may be other statutes that govern, but I think, but that's not what Congress's intent in passing ECOA in 1974 was specifically to prevent discrimination against women on the basis of their marital status when they, you know, in any aspect of a credit transaction was the phrase that Congress used. So there may be some overlap with prohibitions and other statutes, but the question is, what did Congress mean when it, when it, mean to do when it passed ECOA? Thank you. All right, we'll hear from the government, Ms. Bloom. You're muted. You're muted. You have to, she has to unmute. Good morning and may it please the court. Karen Bloom appearing on behalf of the CFPB in order to address the definition of applicant under ECOA and Regulation B. Picking up on where Appellants Council left off. The Bureau agrees that the District Court erred in rejecting the longstanding interpretation of ECOA, which makes clear that the statute's protections apply both to those currently applying for credit and those who sought and have now received credit. Longstanding interpretation by whom? You said longstanding interpretation. By whom? Yes, well, the Bureau made clear that it interpreted the statute that way when it first promulgated Regulation B, but we think that the best reading of the statute itself is that it includes both those who are seeking credit and those who have sought and received credit. Just so I'm clear, an applicant, in other words, once an applicant, always an applicant, as far as you're concerned. The statute does not put any temporal limitation on that and in using the word applicant, it clearly meant to include both those who are applying and those who have applied and been denied. So had they just used the word debtor, that would exclude people. The issue is if you just look at 1691AB, it uses the term applies. That's the problem, right? And you're asking us to look at adverse action, the other sections or subsections where the word applicant appears. But 1691AB, in defining the term applicant, means any person who applies. So that is intention, would you acknowledge, with just standing alone with your position? I don't think so, because 1691A says that the definitions for this section are applicable to the whole subchapter. So the way that applicant is being used in 1691D is to be the same that it's being used in 1691A. And in A, it's clear that Congress intended to prohibit discrimination in any aspect of our credit transaction. So that included discrimination to people while they're applying, as well as discrimination in terms of changing terms or revocation, modification down the road. And the district court's unduly narrow reading of the term applicant can't be squared with ECOA's notice provisions because those require applicants receive an explanation when their existing credit arrangements are revoked or modified. Clearly, those actions only apply to those who have credit, and those terms would become a nullity under the district court's limited reading. More broadly, the district court's interpretation would undermine ECOA's important protections by cabining them to only certain aspects of a credit transaction and would open broad avenues for evasion. For example, despite Congress's explicit extension of anti-discrimination protection to any aspect of a credit transaction, under the district court's interpretation, borrowers who face discrimination in the servicing of existing loans would not be covered by ECOA. What are the implications of that? So there was a question from one of my colleagues about, aren't there other statutes, federal presumably, as well as state and local statutes that would prevent that? Congress intended ECOA to be a broad grant of anti-discrimination protection to people who engage in credit transactions. So whether or not there are other potential protections under state law is irrelevant to the scope of ECOA here. Adopting an interpretation as limited as the district court did would invite evasion because creditors who wish to deny applications on a prohibited basis or offer credit on less advantageous terms to certain borrowers could achieve that by simply extending credit on the terms requested and then later revoking or changing the terms on a prohibited basis. This would introduce a loophole big enough to threaten to swallow whole the notice requirement and the statute's central prohibition on credit. Have any other circuits even come close to addressing this issue? I was not able to find any. No, this is essentially a matter of first impression before this court. This court had... Well, I'm asking about other circuits. I know us. Yeah, the Sixth Circuit, sorry, the Tenth Circuit in 1996, in an unpublished opinion, looked at this, looked at the language of the statute itself. This is in Kinnell v. Convenient Loan Co., 77 F. 3rd 492, and adopted a broad reading that the Bureau advances here in contrast to the smattering of district court opinions. A little bit like the dog that didn't bark. Isn't it odd that something that's this broad and this important hasn't been litigated to death all across the country? I don't think so, Your Honor, because it has long been understood to apply broadly. And so the agencies like the Bureau that have been empowered to take enforcement action and make supervisory exams to enforce the statute have long understood it to cover both those who are currently seeking credit and those who have sought and received credit. What's really going on here? I'll ask this of Capital One, but why is this occurring in this case? Quite frankly, I think there were some district court decisions that without due analysis adopted a superficial reading of the term applicant, and that has gotten some traction, but it ignores the best reading of the statute, which is that consistent with the text structure and purpose of ECOA. It is clear that applicant includes those with existing credit. And just to go back to the point about what it would mean here, the Bureau has taken numerous actions with respect to those who have credit to protect those people as well as those seeking credit. So, for example, there was an enforcement action that two banking subsidiaries had taken discriminatory action against Puerto Rican cardholders, requiring them to pay more money to settle debt than other cardholders had had to pay. That action couldn't have been brought under the district court's limited interpretation of applicant, and there are numerous other examples. Where did that go? Was it challenged in that case? Was that meaning challenged? No, it was not. That was an enforcement action that the Bureau took. It was not raised there. And there are numerous other cases where courts have accepted this definition, and it hasn't been raised, essentially. Has this ever come up in the context of overdraft protection for a checking account? Not that I'm aware of, but it is clear that overdraft protection constitutes credit and that an adverse action taken with respect to an overdraft protection could be an adverse action. And there is joint guidance on overdraft protections that speaks specifically to this. It's at 70 FR 9127 from February 24, 2005. So you're suggesting then that they can't even close the checking account then without getting any kind of notice required under ECOA? No, specifically with respect to the overdraft protection. But my point is overdraft protection is meaningless, but for the ability to write checks, right? There's not going to be any credit necessary if you're not writing checks in the first place. Isn't that obvious? I think there are different ways that overdraft protection is extended. And the point here was that that protection, regardless... There is such a thing as overdraft protection for an account that doesn't exist? Yes, it would largely be tied to an account. Right. So in this case, an account was closed. They said, we're closing your checking account. If they said nothing about overdraft protection, would there be a violation? Considerably, there could have been. There's nothing in the statute that requires them to say something specifically in order to invoke the protections. If they were closing a credit account and not providing adequate notice of it, that would fall within the statute's ambit. Okay. I think we're... Well, just Sullivan and maybe I'm in the same basket. We're trying to figure out, is there something unique about an overdraft line of credit here? Because I also understood that if your underlying checking account is closed, that's sort of the end of the story. I don't get overdraft, but you seem to... So I'm not sure that I understand your answer. I'm not sure the Bureau has a specific opinion on the fact of this case. What we're here to offer the court is our opinion on the possible implications of adopting the limited reading that the district court did. And so the import of this case goes beyond the specific overdraft line of credit implicated here, but really extends to all of the possible ways in which a cabins and narrow reading... Over what's in your checking account. Okay. I'm sorry. That's not what we're talking about. Ms. Bloom, one way to avoid this then would be for us to just say this is not an adverse action because it's not really a revocation of credit, right? Then we wouldn't have to define applicant. I don't think that's correct here because the line of credit was terminated. Your view is terminated and revoked are the same thing. For these purposes, yes, there are... The joint guidance I referenced earlier mentions that there might be actions that can be taken on an overdraft line of credit that would not constitute adverse actions. Those would be incidental, but there's no... Nobody has raised here the argument that this was just incidental. And so that argument really isn't before the court. Could you take us through... I mean, your friend, Mr. Terwinkel's counsel mentioned one possibility related to women who are married, who become married. But what other implications are there for the Bureau? If the court adopted the narrow... Correct. Well, ECOA prohibits discrimination on many bases, so race, national origin, sex. And so to the extent that this court adopted the district court's reading that ECOA only protects those currently applying for credit, they would be essentially reading out the essential protections of ECOA for those who have credit who might face discriminatory terms of their credit or discriminatory termination on basis of race. You're saying this isn't enforced constantly on a daily basis? Those sorts of discrimination are now enforced as a matter of course. The Bureau does do supervisory and enforcement work on the basis of ECOA and Regulation B, the way it is understood and has long been understood to cover both those who are applying for credit and those with existing credit. And as far as we know, it's only in the... Very, very rarely been challenged in court, at most, at best. That's correct. This issue has really not percolated. Has there ever been a challenge to Regulation B? In terms of the definition of applicant, as discussed earlier, there have not been substantive conversations, at least at the level of the Courts of Appeal, about whether Regulation B's interpretation of applicant is permissible. Though it's notable that even the District Court here thought that the Regulation B interpretation was reasonable and permissible, it just thought you didn't reach that because the statute itself was unambiguous. But for the reasons we've discussed, that was error. Thank you very much. We'll hear from counsel for Capital One, Mr. Schmalzbeck. Good morning, Your Honor, and may it please the Court, Brian Schmalzbeck for Capital One. We're here today to address a lawsuit about the closure of a checking account, which is not covered by the Equal Credit Opportunity Act, and its included overdraft line of credit. I'd like to focus on three main points. The first is that because overdraft protection is uniquely contingent on a checking account, plaintiff has not alleged an injury in fact. Plaintiff has not alleged standing. Second, I do want to briefly address why, even on our interpretation of applicants, there are plenty of other laws that address the concerns that the agency and that the plaintiff have raised. May I interrupt you? This is a terrible thing to do, but it's a little difficult to be concentrating on you and your argument with that rather extraordinary background behind you. Can you tell me what that is? That is Richmond's James River, Your Honor. And you're in Richmond. Thank you very much. Go ahead. You're welcome. And third, I need to address an argument that neither the plaintiff nor the agency has touched at all. And that argument is that the plaintiff was not entitled to an adverse action notification at all because there was no adverse action on an application. On an application being the prerequisite for having to send an adverse action notification under 15 U.S.C. section 1691. So to start withstanding, the complaint defeats itself. What's unique about this complaint is that the plaintiff actually attached the email notification that Capital One sent to the plaintiff that says, we are closing your checking account, including its overdraft line of credit. So that email becomes a part of the complaint. It's not something that can be ignored under this court's precedent. It is actually the complaint itself. And in turn, that means that the plaintiff has to allege a particularized injury based on a deficiency in the notice that he actually received, not based on some hypothetical ECOA violation. But there's no plausible allegation that any deficiency in that notice that he actually received and attached to the complaint that caused him any harm. The plaintiff seems to say that the violations under the ECOA were that that email didn't include the creditor's address. And that it didn't include a more specific reason than we closed your checking account, including your overdraft line of credit, your overdraft protection. Even assuming that he's entitled to that information under the act and for purposes of standing, we do assume that. He doesn't allege that he was confused about who his creditor was. He doesn't allege that he was confused about how to contact his creditor. And so that takes this case out of Cohen, which is one of the primary standing cases that the plaintiff relies on. And to the point of the questions that your honors had earlier, the plaintiff doesn't say what, if anything, he would do with a statement more specific than that the overdraft line of credit was included in the checking account that was closed. Because they are the overdraft protection is entirely contingent on the checking account. Once the checking account is closed, that overdraft protection vanishes because there's nothing to protect. The checking account is closed. And in fact, the plaintiff does not even allege that he would have requested a statement of more specific reasons if notified of his right to it. As your honors know, 1691 D does not require the creditor in the first instance to send a statement of reasons to the applicant. The creditor is allowed, if the creditor chooses, to send a notification that the applicant can request that statement of reasons within 60 days. And there's not even an allegation that the plaintiff would have done that here. So in sum, there's no allegation that the information the plaintiff is demanding here actually matters under the specific circumstances of this case. And the absence of information that does not matter creates no argument to address why the concerns raised about the definition of applicant don't matter. And in particular, and I should say, first and foremost, that Capital One is 100% committed to non-discrimination, both as to credit applicants and as to existing customers. But to your honors question about what law applies in the absence of that, there's two that immediately spring to mind. One is 42 U.S.C. section 1981, which protects against discrimination in all manner of contracts. And we would certainly agree that that would cover contracts such as the contract that covers this checking account and its overdraft protection. But as to the plaintiff in particular, who alleges that he was in New York during the relevant period, New York's Human Rights Act, and in particular section 296-A, has a very broad ban on credit discrimination generally. And what's really important here is that New York Human Rights Act ban on credit discrimination, it's not limited to applicants. So it's different in that respect. So let me just, you know, thank you very much, Mr. Schmalzbach, for that. But let me let me point you to Ms. Nichols' Parade of Horribles, the really Parade of Horrible, which is a married woman who, under your, she says, under your interpretation, could be discriminated against under the under ECOA. What's your response to that? So, first, Your Honor, again, that that is not Capital One's practice at all. But you don't have to repeat that. We understand that would certainly be covered by New York's Human Rights Act. No, no, no. I'm asking about ECOA. Right. And under ECOA, I think we should go specifically to what Ms. Nichols was referring to. And that's the Senate report for the original ECOA. And the sentence or the paragraph that she's referring to says this. Creditors generally require a woman who has credit to reapply for credit when she marries, usually in her husband's name. Similar reapplication is not asked of men when they marry. So I think Ms. Nichols was gesturing in the direction of a concern raised in the legislative history. But as we've we've briefed, the correct application of applicants would cover this newly married woman who is forced to apply. She is an applicant. So there's no concern there, Your Honor. And I think it's important to point out what the panel was observing before, which is that these cases are not frequently litigated. When they are litigated, which has only happened in the last couple of decades, almost exclusively with one exception, the definition of applicant that we've briefed has prevailed. But this is not a big problem. There's not an epidemic of discrimination against existing customers, as you might expect.  But I'd like to suggest that the court can consider an independent way of resolving this case on the merits that avoids the need to decide the meaning of applicant. And that independent way of resolving this case on the merits is this, that there was no adverse action on an application. And that action on an application, that's the trigger for the duty to notify under Section 1691D. And so when Section 1691D.2 references action, it references adverse action, it's talking about adverse action on an application. And the statutory text and context, the legislative history... Is the term application defined somewhere? I don't believe that it is, Your Honor. How do we divorce that term from the term applicant? And is there a reason why it's not defined? I think you can glean Congress's understanding of the term application from the context in Section 1691D. Well, context may not be helpful to you, Mr. Schmalzbach. How do we divorce the term application from the term applicant? Maybe your response is we don't. Your Honor, in the arguments that we've addressed in the briefs about the meaning of applicants, it's fully consistent to read them together. But the point I'd like to make here is that even if you don't resolve the meaning of applicant, or even if you agree with the plaintiff about the meaning of applicants, there's still an important separate requirement that the plaintiff has not met here. And I can address that very quickly. Let me interrupt you for a second, because the on an application, on the application is in D.1. And that's a section that talks about the time limitations. It's just about you got you can't let a person linger for six months or two years. You have to respond within a certain period of time, right? That's correct, Your Honor. OK, but that phrase on the application doesn't appear elsewhere in the section, does it? Not in so many words, Your Honor. But the answer was no. OK, so what you seem to be saying is that if a person applies for an app, applies for credit, that application is granted. And then a month later, they have the credit revoked based on race or some other impermissible reason. That's OK, because this doesn't cover it, right? It's OK under ACOA. ACOA does not cover that, correct? I can't necessarily agree with that, Your Honor, because I would need to know the answer to this question, which is why. Was that revocation a result of either some pre-existing plan to, you know, in this hypothetical that the plaintiff tees up? Well, you can have it both ways. It seems to me that you're saying that it only applies for an applicant on an application. It seems to me what you're saying then is revocation only applies. That's an adverse action only if they revoke when you make a new application or an application for an extension or additional credit. Yes, Your Honor, that's certainly an example of when it would be on an application. Another example is if there's some... No, I don't have any trouble figuring out when it would apply. I'm trying to pin you down on when it wouldn't apply. And it seems to me what you're saying is that if application made, application granted, and then promptly revoked for an impermissible reason, you seem to be saying that that isn't covered by this. You've got to go to some other statute because this is only about applications for credit. And once an application has been granted, you cease to be an applicant. Is that fair? It's fair. If that is not action on an application, then yes, our position is that ECOA wouldn't apply. So just to pick up on that, because that's what I understood your argument to be. So hypothetically, let's say that an application is granted and I'm the applicant and the bank finds out three days after granting my application what race I am and decides on that basis to revoke the application. Is that cognizable? Do I have some claim under ECOA? Your Honor, those facts where the credit line is revoked so soon after the application is granted. But I thought you said it's indexed just to the application. The application is done. You've granted the application. You find out my race could be three days later, could be a month later, and there's a revocation. Is that cognizable under ECOA? Now I'm picking up, really, it's just a different form of hypothetical from the one that was well posed by Judge Sullivan. I think a plaintiff alleging those facts, Your Honor, would have a strong case that that revocation so soon after granting the application would be part of a pre-existing plan to deny, which would certainly be action on an application. The hypothetical is you have no idea what my race is or what my gender is and you grant it. And I'm not saying that Capital One is doing this. I'm just giving you a hypothetical. You grant it. And then someone at a bank, Bank X, finds out my race or my whatever protected membership in a protected class and decides to revoke. Yes, Your Honor. Under those circumstances, that plaintiff would have to rely on Section 1981, for example, for that claim. Yes. I'd also like to address the legislative history. Could that person claim, look at it holistically and say that looking at the whole thing, it was a denial rather than a denial of the application? Yes, Your Honor. And I think that person would have a pretty strong case on the pleadings that there's an inference that this really was in substance a denial of the application. That was the point I was trying to make. Thank you. On the legislative history, which, to be clear, we think the text and context and structure of 1691 D is clear, so you don't have to. But just as a belt and suspenders, Congress understood adverse action on an application the way that I am describing today. And the legislative history that is right on point is in the Senate report to the 1976 amendments to the Equal Credit Opportunity Act, which says the formalized statement of reasons called for in this section is appropriate in the committee's view only where there is an equally formalized application for credit. So no application for credit, no statement of reasons necessary. And so we asked the court to recognize that as Congress understood this statute, there has to be adverse action on an application and that if you find as there's no allegation here that there was adverse action on an application, then the plaintiff doesn't state a claim. And finally, a problem with plaintiff's interpretation of 1691 is that there's a gaping hole in the statute. And that hole is that there's no deadline for creditors to provide that adverse action notification. And we know Congress wanted to set a deadline because it did in 1691 D1, as Judge Sullivan pointed out. But if, as plaintiff says, adverse action includes closing an account years after any action on any application, then it would be impossible to meet that D1 deadline of 30 days after action on the application. So under plaintiff's view, the statutory deadline that Congress created would be defective. But that deadline works just as Congress designed when adverse action is correctly confined to adverse action on the application. So we ask this court to adopt the interpretation that makes sense rather than nonsense out of Congress's handiwork. If there's no further questions, we ask you to affirm the district court. Thank you very much. Ms. Nichols, you've got a couple of minutes for rebuttal. Thank you. I want to focus on addressing what seems to be this court's concern that perhaps because it is an overdraft line of credit, it's not credit, the revocation of which is an adverse action. Here again, I want to stress that the account here contained both a depository element and a credit element. And I think there's no question that an overdraft line of credit qualifies as credit under the statute. And that a revocation of that credit, putting the applicant issue to the side, is potentially an adverse action. Now, to be clear, as the CFPB explained, there are regulatory exceptions to the notice of reasons requirement. There are regulatory exceptions to adverse action, which may or may not apply here. Capital One has never argued that any of those regulatory exceptions apply here. It hasn't argued that this isn't credit. It has never raised those arguments. They've not been briefed. We don't have enough information in the record to know whether those regulatory exceptions are met. And so to be very clear, what we know from the record and from the statute is that this is credit that has been revoked. Would you request the gaping hole argument in connection with 1691D1? Sure. So I think the better way to read 1691D1 and 2 is as two separate requirements, right? D1 talks about actions taken on an application and D2 doesn't. Those are two different requirements getting at two different things. With regard to the time limit, you know, I think there's a, I would read that as an implication that when there's, you know, upon sort of the adverse action that you get the statement of reasons, right? I think that's the, and then there's a timeline for when there's a request for statement of reasons discussed in D2B. And so I think that's the better way to read that in the context of the statute as a whole. And again, if there's any ambiguity here, if it's susceptible to more than one reading, then we look at the regulation and there's no dispute that the regulation includes, the regulatory definition includes those with existing and terminated credit. I want to ask, pick up on, so again, I just want to stress again that whether there's some exception to adverse action or some exception to the statement of reasons requirement, there are regulatory exceptions that exist. None of them have been argued here by. Let me ask you this person. Most people would look at this and say the reason is pretty obvious. The checking account for which the credit was being extended, having been closed. That's the reason for revoking or terminating the line of credit. Isn't that sufficient? No, Your Honor. I mean, I think what we don't know here is because we don't know whether his account was closed because of action he took with regard to his overdraft. Line of credit or because of action he took with regard to his depository accounts. We don't know. All right. But then I want to be clear on this then. So then what you're saying is that if they closed his checking account and said nothing with respect to the overdraft protection, that, too, might be a violation of closing a check. Closing a checking account might have been a violation of a code because. Yes, because the checking account includes credit. Right. That if there was no overdraft line of credit included with the checking account, obviously ECOA is not invoked. But if that checking account includes credit, which this one did, then ECOA is triggered because an overdraft line of credit is credit under the statute and that there's there's you know, there's been. That's why we're here. That's why we're here. Right. And so I think, again, whether whether this, you know, meets all the regulatory requirements under adverse action, there's some lots of exceptions and things like that. Capital One's never made any of those arguments there. They've not been briefed. And so I think it'd be inappropriate for this court to to decide whether or not they apply. And your friend also alluded to the Senate report from 1976. I think I saw that, but it reminded me of this reference to formalized application for credit. If we get to the legislative history, what are we to make of that? I would say that there are there are many parts to the legislative history. Other parts of the legislative history, which we cite in our briefing, talk about a unilateral revocation of credit, which indicates to me that an application, an active application is not required. And so I think there's, you know, at best it's it's a little, you know, we cite we quote all of that in our briefing. And so at best it's, you know, it's ambiguous. And then we look at the regulation and to answer, I think, just to just to clean up an answer that was asked with regard to the regulatory definition of applicant. There is a circuit split on another aspect of the regulatory definition that doesn't have to do with whether it applies to existing or terminated borrowers. That's referenced in our briefing. And so just I think, again, the CFPB, as CFPB said, brings lots of enforcement actions under ECOA on the assumption that applicants includes those with existing or terminated credit. And there's just not a lot of private litigation going on. What happens next? So let's say that we agree with you. What happens next? So you I think it would be appropriate to obviously reverse the dismissal and and then remand to the district court for further proceedings on Capital One hasn't filed an answer to the complaint. Is that I make sure I'm answering the question that you intend that I understood your question. So they answer the complaint and then what's the what's the discovery? What is it? What's next? I mean, it could be that Capital One has other arguments as to why there's no violation here. And there might be it might require a review of the terms of the account, which are not here, depends on what they say in their answer. And so I think that's that's how the litigation might proceed here. I think there's you know, if they don't have any other arguments as to why it doesn't apply, then I think we, you know, we move for summary judgment and and complete the litigation. But I think that's, you know, the we're very early stages below the only issues again to stress the only basis for Capital One's motion to dismiss was a 12B1 for lack of standing and a 12B6 because only on the basis that existing and terminated borrowers are not applicants. Mr. Schmalzbeck, I'm sorry, just a housekeeping matter. You'd come back from wherever you are. Do you agree that if we get to Regulation B, then we should we should vacate or reverse? Thank you, Your Honor. No, you shouldn't, because that's the import of the separate argument that from pages 22 to 26 of our brief that I raised today. Even if the Reg B definition of applicant is adopted, there's still this separate question about what adverse action means. Is it adverse action on an application? Okay. Thank you. Um, thank you very much. That concludes today's oral argument calendar. I'll ask the clerk to adjourn court. Ms. Rodriguez. Thank you. Court stands adjourned.